UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

Angela L. Fanelli                    :

    Plaintiff                    : Case No. 3:16-CV-1060

    v.                           :

Carolyn W. Colvin                    : (Judge Richard P. Conaboy)
Acting Commissioner of Social
Security                             :

    Defendant                    :

_____

**Memorandum**

## I.   Background.

We consider here Plaintiff's appeal from a decision of the Social Security Administration ("SSA" or "Agency") denying an application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  Plaintiff filed her application on October 1, 2013 and alleged a disability onset date of September 20, 2013.  The application was denied at the administrative level on December 27, 2013 whereupon Plaintiff filed a timely request for a hearing on January 24, 2014.  In her request, Plaintiff stated that she was unable to work due to various afflictions including cirrhosis of the liver, neuropathy, myelopathy, problems in her cervical spine and thoracic spine, and a herniated lumbar disc.

Plaintiff's hearing was conducted by Administrative Law Judge ("ALJ") Michelle Wolfe on July 15, 2015.  The ALJ issued a decision

1

dated August 25, 2015 that denied Plaintiff's application for benefits.  Plaintiff then requested review by the Appeals Council. The Appeals Council affirmed the ALJ's decision by determination dated April 1, 2016.  The Appeals Councils determination constitutes a final decision by the Agency that confers jurisdiction on this Court to hear Plaintiff's appeal pursuant to 42 U.S.C. § 405(g).

## II.  **Testimony Before the ALJ**.

The Plaintiff testified that she lives in West Wyoming, Pennsylvania in a one-story home.  She lives alone.  She was born on November 12, 1954 and was 60 years of age on the date of the hearing.  She stated that she never worked after her alleged disability onset date, September 20, 2013.  (R.59-60).

`Plaintiff stated that she collected unemployment compensation benefits for about six months after she stopped working.  She stopped working because she had been laid off.  On the date of her hearing she was five feet two inches tall and weighed 140 pounds. She is a high school graduate but has no post-graduate schooling or training.  She is single and has no children.  Plaintiff did not look for other work after she was laid off because she was hopeful that her boss would call her back to her job as a secretary/receptionist.  She had worked for the same company for 26 years.  (R.60-62).

In addition to her duties as a secretary/receptionist,

2

Plaintiff also helped clients of her home builder employer pick colors and choose accessories for their home.  She stated that she believes she has been disabled since her last day of employment because her boss had been very lenient with her due to their long association.  She explained that her boss understood that she had physical difficulties stemming from a liver transplant.  He allowed her to go home when she felt the need and to go into an adjacent room at the work site to lie down if she felt the need.  Her boss understood her physical limitations and accommodated them.  (R.62-63).

Plaintiff also stated that she must be on medication for the rest of her life to prevent her body from rejecting her new liver and to combat Hepatitis C.  She was participating in a pain management program at the time of her hearing at the direction of her primary care physician.  The pain management program had been preceded by a regimen of physical therapy.  Her pain management program included a series of epidural injections.  (R.63-64).

Plaintiff testified further that she uses a variety of medications.  Her anti-rejection medication produces side effects such as diarrhea, urinary urgency, and difficulty sleeping.  She testified that she does not go to bed or rise at any set time.  If she goes to bed late she does not rise until approximately 10:00 a.m.  Her activity level depends upon the way she feels on a given day.  If she feels up to it, she dusts or prepares a simple meal.

Sometimes she orders prepared food and brings it home.  She shops once each week and generally only gets what she needs.  Typically, she will be in the store no more than 15 minutes.  If she purchases anything heavy she gets someone in the store to take it to her car. When she gets home a neighbor will take any heavy items into her house for her.  (R.64-67).

She can do only minimal exercise because of her back problems. She does use a computer but cannot sit at it for long.  She can sit for no more than 15 minutes.  She does walk but cannot go very far before she needs to sit and rest.  When she stands in one place too long she experiences pain in her lower legs and her feet throb. She attributes these symptoms to her neuropathy and myelopathy. She described a "good day" as one where her back pain and neck pain are less severe and her feet are throbbing less than ususal.  A "bad day" is one where she is confined to the couch and only occasionally is able to get up to walk a little.  Such days she really cannot do anything.  She stated that, on average, three days each week are "bad days".  (R.68-70).

Her primary problem is the pain she experiences, to some degree, every day in her feet, legs, neck and back.  She testified that she has a cervical problem that causes neck pain that radiates into her shoulder blades.  At times this pain radiates down her arms and into her hands.  This results in a loss of hand strength. Writing is difficult for her and she sometimes drops things as a

4

result of her hand weakness.  (R.71).

Plaintiff also testified that her earnings began to decrease in 2010 because of her medical problems.  Her boss was flexible with her and allowed her to call off or go home early when her symptoms flared.  Her problems of neck, back, arm, and foot pain were compounded after she underwent her liver transplant in November of 2008.  Afterwards, she also began experiencing general fatigue.  She has problems of urinary and bowel urgency and has had "accidents" at work.  Her doctors have told her that these problems are a result of her anti-rejection medications but that taking these medications is absolutely necessary to prevent scarring of her liver that could lead to the need for a second liver transplant.  Plaintiff opined that she did not know whether such a procedure could even be arranged.  Any medications that she takes must be approved by her transplant team at the University of Pennsylvania Hospital.  After her transplant in 2008, she initially saw these physicians every three months for some time.  Now she follows up with them every six months.  She understands that she will need this type of close monitoring for the rest of her life. (R.71-74).

Carmine Abraham, a vocational expert, ("VE"), also testified. The VE stated that Plaintiff is 60 years of age and close to retirement age.  She has a high school education and her past relevant work has been as a secretary/receptionist - - an

5

occupation listed in the Dictionary of Occupational Titles ("DOT") as "light, semi-skilled work".  The VE was asked a hypothetical question by the ALJ in which he was asked to assume a person of the same age, education, and work experience as the Plaintiff who has the residual functional capacity ("RFC") to work at the "light" exertional level subject to certain limitations including:

> The individual has occasional pushing and pulling with the lower extremity; occasional balancing, stooping, crouching, crawling, kneeling, and climbing; but never on ladders, ropes, or scaffolds.  The individual needs to avoid concentrated exposure to temperature extremes of cold and heat, wetness and humidity, fumes, odors, dust gases, and poor ventilation, as well as vibrations and hazards, including moving machinery and unprotected heights.

Given this RFC profile, the VE was asked whether the individual would be able to perform the Plaintiff's past work as generally and actually performed. The VE responded that, based on that hypothetical, the Plaintiff could perform her past work.

The ALJ then added limitations to the previous hypothetical question including that the individual would be

capable of standing only four hours and walking only four hours during a work day and would need an option to transfer positions from sitting to standing with a maximum of each such interval being up to one hour and that the individual would not be off task when transferring.  Presented with that additional limitation, the VE maintained that the Plaintiff would still be able to perform her past relevant work.  The ALJ then added an additional limitation such that the claimant would be subject to all the limitations already assumed and in addition would be able to work only at the sedentary level. The VE indicated at that point that, given the additional limitation of sedentary work, Plaintiff would be unable to perform her past relevant work.

The VE testified further that, having limited the claimant to a sedentary exertional level with all the other limitations previously discussed, she would still possess transferable skills which could permit her to function in other occupations and that these other occupations would be semi-skilled positions only.  The VE stated that such semi-skilled jobs did exist in significant numbers in the national economy including: receptionist and information clerk.  The ALJ then inquired whether, if the claimant required additional breaks during a work day beyond normal breaks and lunch periods and, as a result, would be off task for more than 20%

of the day, the claimant would continue to be employable in these jobs.  Considering this additional limitation, the VE testified that this would eliminate both the claimant's past relevant work and any other work in the national economy.

The VE was also questioned by the Plaintiff's attorney. Plaintiff's attorney inquired whether, if a person with all the limitations discussed in the ALJ's various hypotheticals could also be expected to miss work more than two times in a month due to her established impairments, whether that person would be capable of employment.  The VE responded that missing work with that frequency would render the claimant unemployable.

## III. Physical Impairment Evidence.

### A.    Dr. Lauren P. Argenio.

Dr. Argenio was Plaintiff's primary care physician at all times relevant to this claim.  Her office notes reveal that she saw Plaintiff in her office on six occasions between October 7, 2013 and January 13, 2015.  On each of these occasions, Dr. Argenio noted gastrointestinal symptoms including diarrhea, secondary to use of an anti-rejection drug prescribed after Plaintiff's liver transplant.  Also, Dr. Argenio's office notes document persistent musculoskeletal problems such as low back pain, multi-level disc disease with myelopathy and neuropathic pain and numbness in both of

8

Plaintiff's legs and feet.  Dr. Argenio consistently assessed that Plaintiff was suffering from cervical and thoracic disc degeneration; cervical, thoracic and lumbar myelopathy; and cervical and thoracic stenosis.  Dr. Argenio referred Plaintiff to Dr. Joseph D. Paz for pain management in August of 2014 due to her persistent complaint of low back pain with attendant numbness, tingling and burning sensation running down both her legs into her feet.  (R.812-843).

**B.    Dr. Joseph D. Paz.**

Dr. Paz initially evaluated Plaintiff on August 13, 2014. Dr. Paz reviewed an MRI of Plaintiff's cervical and thoracic spine dated May 31, 2013.  His interpretation of that film was multi-level spondylotic changes in the cervical spine and severe narrowing of the spinal canal causing spinal cord impingement at C5-C6 and C6-C7.

Dr. Paz also reviewed three films of Plaintiff's lumbar spine taken over a period of 15 years.  These films indicated foraminal stenosis at L5-S1 on the right with mild scoliosis and moderate multi-level degenerative changes involving the discs, end plates, and articular facets by July of 2008.  An MRI of Plaintiff's lumbar spine in March of 2000 disclosed "further degenerative disc disease at L3-L4, L4-L5, and L5-S1...with disc bulging at these levels but no evidence of spinal canal or foraminal stenosis."  On August 13, 2014, Dr.

9

Paz's impressions were: "(1) prominent central and right-sided L5-S1 disc herniation with a large right-sided extruded fragment causing mass effect on the thecal sac.  There is also prominent central bulging of the L4-L5 disc with a degree of secondary narrowing of the canal. (2) There is central bulging of the L3-L4 disc."  Dr. Paz assessed cervicaglia, cervical syndromes not elsewhere class, lumbago and neuritis or radiculitis thoracic or lumbo sacral unspecified.

From August 2014 through December of 2014 Dr. Paz continued to treat Plaintiff.  His office notes of October 1, 2014 allude to an EMG performed by a Dr. Bundy that demonstrated radiculopathy at L5-S1.  (R.at722-723).  He also noted that Plaintiff "has pain across her lower back radiating to both lower extremities along with neuropathic type pain in her ankles and feet."  At this point, Plaintiff was already taking Gabapentin (a nerve pain medication) at a dose of 500 mg., five times daily to try to control her lower limb neuropathy.

On October 28, 2014, Dr. Paz examined Plaintiff once again.  His notes indicate that she presented with low back pain radiating to her buttocks and legs.  She had decreased range of motion in both flexion and extension of her low back with a positive bi-lateral straight leg-raising test.  Dr. Paz also noted that Plaintiff exhibited sacroiliac joint and

10

sciatic notch tenderness along with positive bi-lateral Patrick's, Gillette's, and Gaensler's Tests.  He then gave Plaintiff a sedative and performed a diagnostic epidural steroidal injection at L4-L5 and L5-S1 with fluoroscopy.  His diagnosis at that time was lumbar radiculitis and lumbar stenosis.

On November 11, 2014 and December 2014, Dr. Paz's findings of October 28, 2014 were still present.  On both dates he gave her additional epidural steroidal injections at the River View Ambulatory Surgery Center in an attempt to alleviate the effects of his initial diagnoses of lumbar radiculitis and lumbar stenosis.  (R.700-712).

The last office note offered by Dr. Paz concerning the Plaintiff addresses her visit of December 12, 2015. Dr. Paz noted at that time that Plaintiff continued to experience pain across the lower back and had developed a new complaint, pain over her hips and iliac crests.  Dr. Paz opined that she had developed neuropathic pain from her use of anti-rejection medications.  At this time, Dr. Paz increased her dose of Gabapentin (Neurontin) and recommended bilateral sacroiliac injections under fluoroscopic guidance.  (R.798-800).

C.   **Khella Sami, M.D.**

Dr. Sami, Chief of the Department of Neurology at Penn Presbyterian Medical Center, saw Plaintiff on at least two

occasions.  He initially saw her for a neurological evaluation
on October 16, 2013.  On January 10, 2014, Dr. Sami saw her
for a neurological follow-up.  He noted cervical myelopathy,
disc herniation, and peripheral neuropathy.  He also noted
gait disturbance due to a combination of the myelopathy and
neuropathy.  He described Plaintiff as "a high risk surgical
candidate due to her immunosuppression resulting from her
liver transplant."  Dr. Sami opined that Plaintiff should be
on disability due to "her significant neurologic and other
comorbidities."  (R.340-344).

**D.    Dr. Bahirwani.**

Dr. Ranjeeta Bahirwani, a gastroenterologist at the
University of Pennsylvania Hospital, saw Plaintiff on February
10, 2014.  Her office note of that encounter relates the
diagnoses reached by her colleague, Dr. Sami, in connection
with Plaintiff's neurological symptoms.  With respect to
problems related to Plaintiff's digestive system, Dr.
Bahirwani noted Plaintiff had developed hepatitis C virus
cirrhosis as documented by a liver biopsy performed in
December of 2013.  She noted Plaintiff's complaints of bowel
urgency.  She also noted that Plaintiff's immunosuppressive
medication had been "switched from Tacrolinus to Rapamune due
to severe peripheral neuropathy that has significantly
impaired her quality of life."  Dr. Bahirwani alluded to some

unidentified "they" who had concluded that Plaintiff should be on disability due to significant neurologic problems.  It is unclear, however, whether she shared that assessment. (R.345).

## IV.  ALJ Decision.

The ALJ's decision (Doc. 10-2 at 39-55) was unfavorable to the Plaintiff.  It included the following Findings of Fact and Conclusions of Law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2.  The claimant has not engaged in a substantial gainful activity since September 20, 2013, the alleged onset date of her disability.

3.  The claimant has the following severe impairments: recurrent cirrhosis/hepatitis C status-post orthotopic liver transplantation in 2008, cervical degenerative disc disease/spondylosis with myelopathy, thoracic degenerative disc disease/spondylosis, lumbar degenerative disc disease, and sacroiliitis.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the

listed impairments in 20 CFR Part 404, Subpart
P, Appendix 1 (20 CFR 404.1520(d), 404.1525,
404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire
record, the undersigned finds that the claimant
has the residual functional capacity to perform
light work as defined in 20 CFR 404.1567(b) and
416.967(b) except the claimant: could
occasionally push/pull with the lower
extremities; could occasionally balance, stoop,
crouch, crawl, kneel, and climb, but never on
ladders, ropes, or scaffolds; must avoid
concentrated exposure to temperature extremes
of cold/heat, wetness, humidity, fumes, odors,
dusts, gases, poor ventilation, vibrations, and
hazards, including moving machinery and
unprotected heights; and would be limited to
four hours of standing and walking throughout
the workday, with a sit/stand option, wherein
each maximum interval between transfer would be
up to one hour, but with no time off task.

6.   The claimant is capable of performing past
relevant work as a secretary/receptionist.
This work does not require the performance of

work-related activities precluded by the
claimant's residual functional capacity.

7. The claimant has not been under a disability,
as defined in the Social Security Act, from
September 20, 2013, through the date of this
decision.

## V.   Disability Determination Process.

The Commissioner is required to use a five-step analysis
to determine whether a claimant is disabled.[1]  It is necessary
for the Commissioner to ascertain: 1) whether the applicant is
engaged in a substantial activity; 2) whether the applicant is
severely impaired; 3) whether the impairment matches or is
equal to the requirements of one of the listed impairments,
whereby he qualifies for benefits without further inquiry; 4)
whether the claimant can perform his past work; 5) whether the

---

[1] "Disability" is defined as the "inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental impairment which can be expected to result
in death or which has lasted or can be expected to last for a continuous period of not less that 12
months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

only if his physical or mental impairment or impairments are of such
severity that he is not only unable to do his previous work but cannot,
considering his age, education, and work experience, engage in any
other kind of substantial gainful work which exists in the national
economy, regardless of whether such work exists in the immediate area
in which he lives, or whether a specific job vacancy exists for him, or
whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform.  (R.at 51).

## VI. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See Cotter*, 642 F.2d at 706 ("Substantial evidence" can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for

17

> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See, e.g., Knepp v. Apfel*, 204 F.3d 78,

18

83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . .  the *Cotter* doctrine is not implicated."  *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented."  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.

*See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

**VII. Discussion.**

**A. General Considerations**

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an

20

administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406.  Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

**B.    Plaintiff's Allegations of Error.[2]**

**1.    Whether the ALJ's Determination that Plaintiff Can Perform Her Past Relevant Work is Supported by Substantial Evidence.**

The ALJ based her conclusion that Plaintiff retains the residual functional capacity to perform her past relevant work as a secretary/receptionist on the report of Catherine Smith, M.D., a physician in the employ of the state agency that performs initial disability determinations.  Dr. Smith determined that Plaintiff could perform her past relevant work in her written report of December 26, 2013.  Dr. Smith never examined the claimant or even had any personal contact with her.  Her opinion is based solely upon her review of records from physicians who had treated Plaintiff prior to December

---

[2] Plaintiff has actually identified four alleged errors by the ALJ.  Having reviewed Plaintiff's Brief the Court finds that all alleged errors coalesce into the two questions the Court has analyzed in this Memorandum.

26, 2013.  This Court is skeptical of the ALJ's decision to

assign great weight to Dr. Smith's conclusions.

Dr. Smith's opinion is based only upon cold medical

records compiled by other physicians.  The Court must note

that these cold records did include objective diagnostic test

results in the form of EMG's and MRI's that posit

radiculopathy at L5-S1, degenerative disc disease at L3-L4,

L4-L5, and L5-S1 and L5-S1 and multi-level spondylotic changes

in the cervical spine causing deformity of the spinal cord and

cord impingement at C5-C6 and C6-C7.  (R.at 700-702 and 722-

755).  Despite these well-documented objective findings, Dr.

Smith noted no impairment related to Plaintiff's obviously

compromised back.[3]

Reliance upon Dr. Smith's conclusions is also rendered

unreasonable in light of subsequent reports by treating

physicians Sami, Bahirwani, Argenio, and Paz that either

explicitly opine that Plaintiff is disabled or strongly

support that proposition.  The preference for evidence

provided by treating physicians, particularly when supported

by diagnostic testing as is the case here, is well established

in this Circuit.  Morales v. Apfel 225 F.3d 310, 317 (3d. Cir.

2000).  See also 20 CFR § 404.1527 that directs the agency

---

[3] The ALJ may have been aware of this deficiency given her statement that she "does not concur with every limitation suggested by this evaluator (Dr. Smith) or the evaluator's exclusion of other limitations warranted by the evidence...".  (R.49-50).

that the opinion of the treating physician should be given
controlling weight if well-supported by medically acceptable
clinical and laboratory diagnostic techniques and not
inconsistent with other substantial evidence in the record.
The question here is whether Dr. Smith's report can be viewed
as "other substantial evidence in the record."

The unequivocal opinion of Dr. Sami, buttressed by the
findings of Drs. Paz, Argenio, and Bahirwani, that Plaintiff
is disabled constitutes powerful and obviously substantial
evidence.   The report of Dr. Smith, based upon medical records
that predate treatment afforded by the treating physicians,
seems too tenuous to constitute the requisite substantial
evidence to support the ALJ's RFC finding here.   Dr. Smith's
conclusions are further compromised by her inexplicable
failure to even allude to any impairment related to
Plaintiff's exceedingly well-documented back symptomology.
This necessitates a remand for the Agency to re-evaluate
Plaintiff's residual functional capacity.   To find otherwise
would be an abdication of this Court's responsibility under
Richardson and Dobrowolsky, supra.

**2.    Whether the ALJ Adequately Explained the Reasons for
Discounting the Claimant's Subjective Complaints of
Pain?**

Plaintiff testified at length about the persistence and

23

intensity of her pain in the low back radiating down her legs and into her feet as well as her pain in the cervical region radiating down her arms and into her hands.  When a claimant testifies as to the limiting effects of pain stemming from impairments established, as here, in the record, such complaints are normally entitled to great weight.  Sykes v. Apfel, 228 F.3d 259, 266 (3d. Cir. 2000).  An ALJ may not discount such complaints without credible contrary medical evidence.  Green v. Schweiker, 749 F.2d 1066, 1068 (3d. Cir. 1984).  The Court has thoroughly reviewed this record and has found no such contrary medical evidence.  Certainly, the ALJ's opinion points to none.

The ALJ has conceded that Plaintiff has multiple well-documented back problems.  (R.48).[4]  The ALJ then offers the familiar recitation that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  (Id.).  The ALJ's explanation for impugning Plaintiff's credibility does not afford a reasonable basis to discount Plaintiff's account of the character and intensity of her pain.

---

[4] The ALJ has acknowledged that Plaintiff has severe medical impairments that could be expected to produce such pain including cervical degenerative disc disease/spondylosis with myelopathy, thoracic degenerative disc disease/spondylosis, lumbar degenerative disc disease/radiculopathy and sacroiliitis.  (R.45).

We learn that the Plaintiff underwent lumbar spinal injections and sacroiliac injections on no few that five occasions from January through May of 2015.  These injections supplemented various pain control medications the Plaintiff had been ingesting since at least 2013.  We are then told that Plaintiff had a negative straight-leg raise test in January of 2015 and that her pain was reduced by 35% after a May, 2015 spinal injection.  (R.49).  We are not informed, however, that Dr. Paz noted positive bi-lateral straight-leg raising tests on multiple occasions along with positive Patrick's, Gillette's, and Gaensler's tests on multiple occasions. Neither are we informed that Plaintiff's relief from pain after each of her epidural injections was short-lived and, thus, necessitated numerous repeat procedures.  This sort of evaluation, where the evaluator mentions only isolated facts that militate against the finding of disability and ignores much other evidence that points another way, amounts to a "cherry-picking" of the record which this Court will not abide.  See Dyer v. Colvin, 2015 WL 3953135 (M.D. Pa. June 29, 2015); see also Pike v. Colvin, 2015 WL 1280484 (W.D. NY March 20, 2015).

Still another infirmity of the ALJ's reasoning is her decision to rely on Dr. Smith's opinion for one purpose and discount it for another.  (R.49-50).  Her explanation for

25

doing so is cryptic and inadequate.  Thus, because the Court finds the ALJ's explanation for not fully crediting Plaintiff's complaints regarding the limiting effects of pain that is logically related to her documented impairments, this case must be remanded for the Agency to clarify or justify its conclusion.

## VIII.    Conclusion.

This case involves a woman 63 years of age who worked for 26 years for the same employer.  The record copiously documents numerous severe medical impairments and the claimant's testimony regarding the limiting effects of these impairments, by the Agency's own reckoning, "could reasonably be expected to cause the alleged symptoms" of which Plaintiff complains.  Accordingly, this case is remanded to the Social Security Administration to better explain: (1) what evidence actually supports the proposition that the claimant has the residual functional capacity to perform her past relevant work; and (2) why Plaintiff's complaints of debilitating pain were regarded as non-credible.  In the alternative the Social Security Administration may choose to award benefits inasmuch as there is certainly substantial evidence of record to justify that result. An Order to this effect will be filed contemporaneously.

S/Richard P. Conaboy  
Honorable Richard P. Conaboy  
United States District Court

Dated: February 10, 2017